AGNES GRIFFIN VS. EX'ORS. GRIFFIN.

*Appeal from the Court of Ordinary.*

A Will set aside on the ground of insani'y, against the testimony of the subscribing witnesses, where there was proof of previous insanity ; where the disposition of the property was not rational or natural, and circumstances of mystery and suspicion were thrown around the subscribing witnesses.

Where previous insanity is shewn, the burthen of proof is thrown on the party, who seeks to establish an act as done in a lucid interval.

But proof that the act done, was in itself natural and rational, will control evidence of habitual insanity.

## By CHARLTON, Judge.

THIS is an appeal from the Inferior Court of *Washington* county, sitting for ordinary purposes ; and the following is a transcript of the proceedings of the Court below :

" GEORGIA, WASHINGTON COUNTY,
*March Term*, 1822.

And now at this term, the will of *Allen Griffin* was offered (before the Honorable the Justices of the Inferior Court, sitting for ordinary purposes,) for the purpose of proving the same, when *Agnes Griffin* appeared before said Court, and entered her *caveat* against the proof thereof, on the following ground to wit : for that the testator *Allen Griffin* was *non compos mentis*, at the time of signing and making the will, and it is thereby void in law, and prays an enquiry of the Court.

SAFFOLD & GLASCOCK, for Caveator.

And *Thomas Pace*, one of the Executors named in the last will and testament of the said *Allen Griffin*, says and avers, that the testator was of sound and disposing mind and memory, at the time he made and executed his last will and testament, and that

PART I.—C. 2.

it is a good and valid Will in law, and this he prays may be enquired of by the Court.

R. L. GAMBLE, Attorney for Ex'or.

This issue on the caveat appears to have received the decision of the Court, and the arrangement between the Proctors is, as I understand it, to submit the whole case to me, upon the evidence taken before the Court below, as well as the evidence taken upon interrogatories since the translation of the case by appeal, to this tribunal.

The fundamental doctrine as involved in the case before me is, "when a will is to be established, the testator must be proved to be of sound and disposing mind." *Wallis* vs. *Hodgson.* 2 Atk. 56. The *widow* and *Caveator*, contests the validity of the will of *Allen Griffin*, alledging, that he was not of sound and disposing mind, at the time of its execution.

The evidence taken under interrogatories is in substance, as follows : *James G. Tigner*, *James Thigpen*, and *John Whittle*, are the subscribing witnesses, and depose, that they were subscribing witnesses to *Allen Griffin's* will, bearing date 31st December 1821, saw him sign and acknowledge the same, and that they all signed in the presence of the testator, and in the presence of each other. *James G. Tignor* and *John Whittle*, say—that they believe the testator was of sound and disposing mind and memory. *James Thigpen* was very little acquainted with the testator, and but a short time in his presence, and deposes—that after signing the will, the testator picked it up, and acknowledged it to be his last will and testament.

*James G. Tignor* further says, that he read the will over to the testator, and as it was read, the testator "*looked over it, and expressed himself satisfied;*" and this subscribing witness deposes also—that he had written three wills for the deceased, and that the greater part of the property, was given in each will, as in the present.

Upon his cross-examination, this witness answers to the second interrogatory : " thàt after he, (the testator) had written his christian name, he commenced writing his *surname*, with a small g,· then stopped and asked witness to make a capital G, which witness did on an old letter, and then he, (the testator,) made the G, which caused the blot in his name."

*James Thigpen*, and *John Whittle*, the other subscribing witnesses, also depose to the correctness of this statement.

To the third cross-interrogatory, *James G. Tignor* answers— that he read the will over to the deceased, and that no other person was present, " but himself and deceased."

To the fourth cross-interrogatory, all the subscribing witnesses answer and say, that they, " know nothing which indicated insanity."

The answers of *Tignor* and *Whittle* in relation to the " *swapping*" of negroes, shew that the testator had a rational and good motive for any supposed inequality, in the value of the exchanged negroes.

Upon this evidence the executors rest the case as to the sanity of the testator, at the *period* of signing the will.

The evidence invoked by the *caveator*, is as follows, as far as I deem it material to advert to it.

Two physicians, *William P. Haynes* and *L. M. Robison*, to. the direct interrogatories depose—that they were called to see *Allen Griffin*, the testator, about the 8th or 10th January, (1822) and found him unqualified for the transaction of any business of importance, which incapacity, they believed to be owing to an effusion of water into, and pressing upon the brain, and that he could not have been *compos mentis* for several days previous to their being called in.

They answer to the second interrogatory, that the testator, on many of their visits to see him, did not know either of them.

Dr. *Haynes*, in answer to the fourth cross-interrogatory, deposes—that the illness of the testator came on some time in June, or July last year, (1821) by a sudden and violent attack of apoplexy, after which he had an attack of palsy, terminating in a dropsy ; and both these physicians in answer to the interrogatory say—that the disease of the testator terminated in death, about the middle of February of the present year, (1822).

Mrs. *Judy White* deposes—that she was at the house of *Allen Griffin*, on the 31st of December, (1821) and 1st of January, (1822) and was *frequently* at his house, from time to time thereafter, *until his death :* That she knows nothing of a will said to have been drawn by Mr. *Tignor :* That she did not believe Mr. *Griffin* to have been of sound mind, on the last day of December, (1821) and her reason for thinking so was, from his frequently asking for many things which he did not recollect the day after.

Mrs. *Mary Saunders* deposes—that she knows nothing of the will wrote by *Tignor :* That she was frequently at Mr. *Griffin's*, from about the 20th December, (1821) until his death ; and that during the time she was at Mr. *Griffin's* house, he was frequently out of his senses—believes he was so, for that while eating, he would mistake " butter for bread," and take other cups for his own, at a time, when he was helped to his table, in the fore part of January last, (1822).

*Darius Thomas* deposes—that he did not believe the testator was in sound mind, when he saw him about the middle of January last, (1822) and the reason for believing him so, is, that he (the testator) would frequently ask questions, after repeatedly receiving answers ; and that he discovered the insanity, (assigning his reason for believing so, as before,) about the middle of July last, (1821).

*Willlam West* deposes—that he was Mr. *Griffin's* overseer the last year, (1821) and believed him frequently insane from the month of June, (1821) until his death; and the reasons of witness for believing so, were,—that he (Mr. *Griffin*) would frequently order to be done what he would often blame deponent for doing; and that he (*Griffin*) "knew nothing of things one half his time." This witness to the third cross-interrogatory answers; that in conversation with Mr. *Griffin,* he heard him (*Griffin*) say, "his wife (the *caveator*) need not want him out of the way, for she should not be the better off by it."

All these witnesses depose—that they "knew nothing of a will having been executed."

Mr. *West* also deposes—that *Andrew* was to be benefitted by testator's will.

*Jacob Giles* deposes—that about the year 1810, he heard *Allen Griffin* say: That a Mr. *Richard Lyons'* children should have his property after his (*Griffin's*) death, and would frequently say the same, at every time witness saw him, until the last time testator mentioned it, when he (testator) observed: "Things had changed, inasmuch as he had got married to *Agnes,* (the *caveator*) and should she out-live him, he must leave her comfortable, but the balance of his property should go to Mr. *Lyons'* children."

Upon this evidence the question for my determination is, whether the deceased had a testamentary capacity, at the *period* when the will was made?

It is said by Sir *John Nichol,* in the case of *White* vs. *Driver,* (1 *Phil.* 38): "That wherever previous insanity is proved, the burthen of proof is shifted, and it lies with those who set up the will, to produce satisfactory proof of the will, *at the time the act was done.*"

And by Sir *William Wynne,* in *Cartwright* vs. *Cartwright,*

(1 *Phil.* 100): "If you can establish that the party afflicted habitually by a malady of the mind, has intermissions, and if there was an intermission of the disorder at the time of the act, that being proved is sufficient, and the general habitual insanity will not affect it; but the effect of it is this, it inverts the order of proof and of presumption, for until proof of habitual insanity is made, the presumption is that the party agent like all human creatures was rational; but where an habitual insanity in the mind of the person who does the act is established, there, the party who would take advantage of the fact of an interval of reason, must prove it; that is the law; so that in all cases the question is, whether, admitting habitual insanity, there was a lucid interval or not to do the act. Now I think the strongest and best proof that can arise as to a lucid interval is that *which arises* from *the act itself;* that I look upon as the thing first to be examined, and if it can be *proved* and *established,* that it is a rational act, rationally done, the whole case is proved."

Adopting the rules and principles of these cases, as my guides in the determination of the present contest, what does the evidence establish, as to the testamentary capacity of the testator, *anterior* to the period of making his will?

Doctors *Haynes* and *Robison* depose, that on the 8th or 10th of January, the testator was not qualified for the transaction of any important business—and that for several days previous to their being called in he must have been "*non compos mentis.*"

This incapacity they say, resulted from "an effusion of water pressing upon the brain;" an affliction I believe, than which, no other is more eminently calculated, to produce mental imbecility or incapacity for the serious and deliberate concerns of this life. It appears also, from the testimony of Dr. *Haynes,* that in July of the preceding year, the deceased had an attack of apoplexy—then of palsy, which terminated in dropsy. I am not skilled in

these matters, but I think I may venture to say, that these attacks in July, from the *nature* of the diseases (in the absence, if I may call it, of scientific proof,) are not to be presumed to have so prostrated the mental energies of the deceased, as to have incapacitated him from a testamentary disposition of his estates: The question is, whether " this effusion of water into, and pressing upon the brain," was of a continuous operation from the 31st of December, to the periods referred to by these physicians? As informed, the *Denouement*—the catastrophe of this disease is, when the effusion takes place—but, that its advances to that catastrophe, *may have commenced* at the *date* of the will, and produced a mental derangement, destructive of a sedate or dispositive condition of mind. Is it probable—or rather does the testimony of other witnesses raise a presumption, that such was the condition of the testator's mind, at the period of making his will?

Mrs. *White*, was frequently in testator's house from 31st December to 1st January, and until his death—and says she was at his house on the 31st of December and 1st January—and from those periods to the time of his death, she assigns good reasons for her belief of the testator's insanity. She knew nothing about a will.

Mrs. *Saunders*, was also frequently at testator's house from 20th of December to the time of his death, and her reasons are also very cogent for the belief expressed by her—that the testator was not of sane mind, from the *time* in December she speaks of, to the period of testator's death.

The intimacy which these witnesses seem to have had in the family of the testator, combined with the observations they depose to have made upon his conduct and actions, certainly enabled them to deduce very satisfactory conclusions, as to the state of his mind, or, the probable state of his mind, at the period it is said his will was executed.

The situation of Mr. *West*, as overseer of the deceased, which

necessarily demanded daily observation and intercourse, enabled *him*, to form an opinion perhaps with more conclusiveness, than any other person, as to the sanity of the testator; he traces the mental aberrations of testator back to June; and *his reasons* for believing him insane from that time, to the period of death, are extremely convincing.

Mr. *Thomas* also assigns his reasons for a belief, that the testator was insane in July, and seems to entertain little doubt, that he was so in January.

The evidence thus adverted to establishes a derangement, at least the want of a testamentary capacity, from June 1821, to the period of testator's death, which happened about two months after signing the will: and this derangement must have been *continuous*, (if these witnesses speak truth,) for, the evidence refers to no intermissions.

But, if the subscribing witnesses are to be accredited, *the acts* of the testator, at the period of making the will were both deliberative and dispositive—they all believed him to be of sound mind and memory. It could have been only *simple belief* on the part of *Thigpen*, because he was "little acquainted with testator, and but a short time in his presence." He infers, I presume, that the testator was sane, as "after signing the will, he (the testator) picked it up, and acknowledged it to be his last will and testament."

*Tignor* deposes, that he read over the will to the testator, (*no person being present but himself and testator*,) "and as it was read, the testator looked over it, and expressed himself satisfied;" and that he had written three wills for deceased, of a similar import.

Previous insanity having been proved by *caveator*, have the executors, who now endeavor to set up the will, adduced through these subscribing witnesses, satisfactory proof of sanity, *at the time* the will was made?

[Griffin vs. Ex'ors. Griffin.]

These persons have been examined to the *factum* of the will, and are the persons usually "capable (in the language of Sir *William Wynne*,) of giving an account of the manner, in which it was actually obtained." I must confess, that this consideration, combined with another, that they could have had no little interest or motive, in giving a false coloring to this solemn act of the testator, and therefore, must have been impressed with the convictions stated by them, I say, these considerations, have pressed heavily upon my mind in weighing, and rejecting their testimony in my determination of this cause. One solitary circumstance, however, as represented by *Tignor*, and confirmed by the other two subscribing witnesses, has had considerable influence in persuading me, that the testator was not of sound mind, at the period of signing the will; and it is, his incapability of making, or not recollecting how a capital G ought to be made, when about to write his surname. He could not recollect its shape or form, before instruction from *Tignor*. Now it is strange, that a man accustomed to write his own name, and not proven to be very illiterate, should in a moment forget the form of the capital letter, with which his surname commenced. Is that—can it be a state of intellect, evincing a sound and disposing mind, at a time, when a man is about to leave this world, and manifesting his last acts of benevolence, gratitude, or affection?

Is there too much inconsistency in the testimony of *Tignor*, who says—that the testator looked over the will, (when he, the witness, was reading it,) and expressed himself satisfied. How could the tes ator express himself *satisfied*, after *looking* over the will, when he could not remember the shape of the capital letter G? With that defect of memory, what benefit could he have derived from *looking* over the will?

This will *might* have been similar to others, drawn by *Tignor*, but that circumstance is of little moment, if the testator was really

PART I.—D. 2.

ignorant of the contents of the paper he was then signing. Besides, the concealment of this will, or the silence observed in relation to it by *Tignor* and the other subscribing witnesses, throws a mystery over the act, not at all reconciliable to the alleged sanity of the testator. If all matters had been " above board," why should Mrs. *White*, Mrs. *Saunders*, and Mr. *West* have remained profoundly ignorant of the fact, that the testator had on the 31st of December made his will?

Mrs. *White*, was in the house on that day, so was Mrs. *Saunders*, from aught that appears from the testimony; and it is to be presumed that *West* was, from his situation as overseer; and yet, the three subscribing witnesses were *all* present, and so managed all the solemnities and forms necessary to the legal execution of the will, as to prevent the intrusion, or observation of any other person, or even to excite suspicion in the minds of the persons who were so much in attendance as Mrs. *White* and Mrs. *Saunders!!*

Was all this done with a view of preventing an accurate recollection of Mrs. *White*, Mrs. *Saunders*, or Mr. *West*, as to the state of the testator's mind at the *hour* of the *day* of the 31st of December, when the testator signed the will?

Whatever may have been the motives of *Tignor* and the other subscribing witnesses, I can only say, that the most unfavorable inference is to be deduced from the mystery and concealment, which enveloped their agency as subscribing witnesses, particularly as the " swapping," or exchange of negroes between the *testator* and *Tignor*, and *Whittle*, may probably have, in some small degree, influenced them in establishing his sanity.

But, notwithstanding the testimony of the witnesses which establish so conclusively, the continuous derangement of the testator; yet, if the will proclaimed a rational disposition of his property, such a will, as every one would say, was honorable, righteous, and natural; such a disposition would establish a lucid inter-

[Griffin vs. Ex'ors. Griffin.]

val, not to be controled by proof of even habitual insanity. Such is the language of the cases cited, and it is founded on the civil law, which, I agree with Sir *William Wynne*, is the rule of the English law : it is a rule also incorporated into the jurisprudence of Georgia : *furiosi autem si per id tempus fecerint testamentum quo furor eorum intermissus est, jure testati esse videntur.* (*Inst.* Lib : 2, tit xii. Sec : 2.) But if the madman make his will during a lucid interval, he is a legal testator.

Now, in this will a very scanty and illiberal provision is made for his wife, and his estate is bequeathed to persons to whom, upon the *face* of the will, he appears to be bound by no ties of duty, gratitude, or consanguinity, and in opposition (according to the testimony of *Giles,*) of repeated declarations, as to *other* objects of his bounty and affection. Applying this rule, therefore, of the civil law, it is not such a will as one habitually insane, can be presumed to have made during the happy occurrence of a lucid interval. Upon the whole, I am of the opinion the testator, *Allen Griffin,* at the time of making his will was not of a sound and disposing mind and memory.

It is therefore *ordered,* that the case be, and is hereby remand, to the Inferior Court of the said County of *Washington,* sitting for ordinary purposes, with instructions, and the said Court is also hereby instructed, to refuse probate of said will to the executors named therein, and to grant administration to such person or persons as said Court may appoint, under the directions of the Act of the General Assembly in such cases made and provided.

Saffold & Glascock, for caveator—R. L. Gamble, Attorney for executor.